

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**SUSIE ANNIE BALFOUR A/K/A
SUSAN ANN BALFOUR**                                        **PLAINTIFF**

**V.**                                                  CAUSE NO. 3:24-cv-93 KHJ MTP

**JACKSON HMA, LLC D/B/A MERIT**                          **DEFENDANTS**
**HEALTH CENTRAL, VITALCORE**
**HEALTH STRATEGIES, LLC, WEXFORD**
**HEALTH SOURCES, INC.; CENTURION OF**
**MISSISSIPPI, LLC, GLORIA MANGUM**
**PERRY, M.D., MOHMED EL ZEIN AHMED, M.D.,**
**JOSEPH ARTHUR OLIVER, M.D., ERIC**
**LANE RUSHING, M.D., DEREK SCOTT**
**DYESS, M.D., YVONNE BARTON, KATRICE**
**FUNCHESS, LINDA NOLAN, IRISH HARRIS,**
**JOHN DOES 1-10 (OWNERS/OPERATORS),**
**JOHN DOES 11-50 (NURSES), JOHN DOES 51-100**
**(DIRECT CARE WORKERS), JOHN DOES 101-110**
**(PHYSICIANS), JOHN DOES 111-125 (OTHER**
**INDIVIDUALS AND/OR OTHER ENTITIES**
**CAUSING OR CONTRIBUTING TO CAUSING**
**INJURIES)**

---

**COMPLAINT**
***JURY TRIAL DEMANDED***

---

    **COME NOW**, Plaintiff Susie Annie Balfour, also known as Susan Ann Balfour, by and

through her undersigned counsel, and asserts the following causes of action against Defendants

Jackson HMA, LLC d/b/a Merit Health Central, VitalCore Health Strategies, LLC, Wexford

Health Sources, Inc., Centurion of Mississippi, LLC, Gloria Mangum Perry, M.D., Mohmed Zein

Ahmed, M.D., Joseph Arthur Oliver, M.D., Eric Lane Rushing, M.D., Derek Scott Dyess, M.D.,

Yvonne Barton, Katrice Funchess, Linda Nolan, and Irish Harris.

**PARTIES**

1.   Plaintiff Susie Annie Balfour, also known as Susan Ann Balfour, is an adult resident citizen of the State of Tennessee and resides at 5187 Ogunquit Lane, Memphis, Tennessee 38118. At all relevant times herein, Plaintiff was an inmate in the custody of the Mississippi Department of Corrections and was housed at the Central Mississippi Correctional Facility.

2.   Jackson HMA, LLC ("**Jackson HMA**") is a Mississippi limited liability company doing business under the name Merit Health Central that owns and/or operates a medical facility located at or near 1850 Chadwick Drive, Jackson, Mississippi and may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

3.   Jackson HMA North Medical Office Building, LLC ("**Jackson HMA North**") is a Mississippi limited liability company closely affiliated with Jackson HMA, sharing identical headquarters, officers/directors, effective dates of incorporation, and merger history. They may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

4.   VitalCore Health Strategies, LLC ("**VitalCore**") is a Kansas limited liability company that is registered to do business in the State of Mississippi and may be served with process through service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi. Under a contract for services with the Mississippi Department of Corrections, VitalCore was responsible for providing medical and/or

healthcare services, either directly or indirectly, to incarcerated individuals throughout the State of Mississipp and, accordingly, is a state actor under 42 U.S.C. §1983.

5.    Wexford Health Sources, Inc. ("**Wexford**") is a Florida corporation that is registered to do business in the State of Mississippi and may be served with process through service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi.  Under a contract for services with the Mississippi Department of Corrections, Wexford was responsible for providing medical and/or healthcare services, either directly or indirectly, to incarcerated individuals throughout the State of Mississippi and, accordingly, was a state actor under 42 U.S.C. §1983.

6.    Centurion of Mississippi, LLC ("**Centurion**") is a Mississippi limited liability company that may be served with process through service upon its registered agent, C.T. Corporation System, 645 Lakeland Drive East, Suite 101, Flowood, Mississippi.  Under a contract for services with the Mississippi Department of Corrections, Centurion was responsible for providing medical and/or healthcare services, either directly or indirectly, to incarcerated individuals throughout the State of Mississippi and, accordingly, was a state actor under 42 U.S.C. §1983.

7.    Gloria Mangum Perry, M.D. is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere she may be found.  At all relevant times herein, Dr. Perry was an employee and/or agent of Wexford, VitalCore, and/or Centurion and was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Dr. Perry was responsible for Ms. Balfour's medical care.

3

8.     Mohmed El Zein Ahmed, M.D. is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere he may be found.  At all relevant times herein, Mohmed El Zein Ahmed, M.D. was an employee and/or agent of Wexford, VitalCore, and/or Centurion and was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Dr. Ahmed was responsible for Ms. Balfour's medical care.

9.     Joseph Arthur Oliver, M.D. is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere he may be found.  Upon information and belief, Dr. Oliver was an employee and/or agent of Wexford, VitalCore, and/or Centurion and was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Dr. Oliver was responsible for Ms. Balfour's medical care.

10.    Derek Scott Dyess, M.D. is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere he may be found.  Upon information and belief, Dr. Dyess was an employee and/or agent of Wexford, VitalCore, and/or Centurion and was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Dr. Dyess was responsible for Ms. Balfour's medical care.

11.    Eric Lane Rushing, M.D. is an adult resident citizen of the State of Mississippi and may
be served with process through personal service anywhere he may be found.  Upon
information and belief, Dr. Rushing was an employee and/or agent of Wexford,
VitalCore, and/or Centurion and was responsible for providing medical treatment and
care to individuals in the custody of the Mississippi Department of Corrections.  Because
of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional
Facility, Dr. Rushing was responsible for Ms. Balfour's medical care.

12.    Yvonne Barton is an adult resident citizen of the State of Mississippi and may be served
with process through personal service anywhere she may be found.  Upon information
and belief, at all relevant times herein, Ms. Barton was an employee and/or agent of
Wexford, VitalCore, and/or Centurion who served as the MDOC Specialty Care
Coordinator.  In that position, Ms. Barton was responsible for providing medical
treatment and care to individuals in the custody of the Mississippi Department of
Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central
Mississippi Correctional Facility, Ms. Barton was responsible for Ms. Balfour's medical
care.

13.    Katrice Funchess is an adult resident citizen of the State of Mississippi and may be served
with process through personal service anywhere she may be found.  Upon information
and belief, at all relevant times herein, Ms. Funchess was an employee and/or agent of
Wexford, VitalCore, and/or Centurion who served as the MDOC Nurse Specialty Care
Coordinator.  In that position, Ms. Funchess was responsible for providing medical
treatment and care to individuals in the custody of the Mississippi Department of
Corrections.  Because of Ms. Balfour's status as an incarcerated individual at Central

Mississippi Correctional Facility, Ms. Funchess was responsible for Ms. Balfour's medical care.

14. Linda Nolan is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere she may be found. Upon information and belief, at all relevant times herein, Ms. Nolan was an employee and/or agent of Wexford, VitalCore, and/or Centurion who served as the MDOC Specialty Care Coordinator. In that position, Ms. Nolan was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections. Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Ms. Nolan was responsible for Ms. Balfour's medical care.

15. Irish Harris is an adult resident citizen of the State of Mississippi and may be served with process through personal service anywhere she may be found. Upon information and belief, at all relevant times herein, Ms. Harris was an employee and/or agent of Wexford, VitalCore, and/or Centurion who served as the MDOC Medical Claims Officer and Medical Compliance Officer. In that position, Ms. Harris was responsible for providing medical treatment and care to individuals in the custody of the Mississippi Department of Corrections. Because of Ms. Balfour's status as an incarcerated individual at Central Mississippi Correctional Facility, Ms. Harris was responsible for Ms. Balfour's medical care.

16. John Does 1-10 (Owners/Operators) are upon information and belief additional entities and/or individuals, identity and residency currently unknown or indefinite, who own, control, and/or manage a hospital or medical facility which was responsible for the treatment and care of Ms. Balfour during dates of the occurrences which form the basis

for this lawsuit.  Plaintiff reserves the right to identify or change the identity of these defendants based upon discovery.

17.     John Does 11-50 (Nurses) were nurses caring for Ms. Balfour during the dates of the occurrences that form the basis for this lawsuit. It is believed that these defendants are likely residents of Mississippi.  Plaintiff reserves the right to identify or change the identity of these defendants based upon discovery.

18.     John Does 51-100 (Direct Care Workers) were nurse's aids, certified nurse's assistants, orderlies, physical therapists and other direct care workers who cared for Ms. Balfour during the dates of the occurrences that form the basis for this law suit. It is believed that these defendants are likely residents of Mississippi. Plaintiff reserves the right to identify or change the identity of these defendants based upon discovery.

19.     John Does 101-110 (Physicians) were physicians who provided any treatment or care to Ms. Balfour in connection with her annual mammograms during the dates of the occurrences that form the basis for this lawsuit. It is believed that these defendants are likely residents of Mississippi.  Plaintiff reserves the right to identify or change the identity of these defendants based upon discovery.

20.     John Does 111-125 (Other Individuals or Entities Causing or Contributing to Causing Injuries) are any other individuals or entities who wrongfully contributed to the injuries to Ms. Balfour who breached any duties owed to Ms. Balfour, or who succeeded to, bought, controlled, or assumed the liabilities of any Defendants herein, or whom it may be discovered are liable under any theory for the damages covered by this complaint. Plaintiff reserves the right to identify or change the identity of these defendants and to

specify the causes of action asserted against them upon obtaining the necessary information through discovery or otherwise.

## JURISDICTION AND VENUE

21.    Ms. Balfour asserts her federal civil rights claims pursuant to 42 U.S.C. § 1983 and asserts her claims for Defendants' negligence under Mississippi law. Thus, this Court has subject matter jurisdiction over Ms. Balfour's claims arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over Ms. Balfour's state law negligence claims pursuant to 28 U.S.C. §1367.

22.    This Court has personal jurisdiction over Defendants because, at all relevant times herein, Defendants continuously and systematically conducted business in the State of Mississippi and within this District.

23.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) as a substantial part of the events giving rise to the claims at issue occurred within the Southern District of Mississippi.

## FACTUAL BACKGROUND

24.    For thirty-three years, Ms. Balfour was in the custody of the Mississippi Department of Corrections (hereinafter "MDOC") at Central Mississippi Correctional Facility (hereinafter "CMCF"). During that time, upon information and belief, Ms. Balfour and other incarcerated individuals at CMCF were required to clean the prison with chemicals known to cause, or to contribute to causing, breast and other cancers without any protective equipment, including but not limited to glyphosate. It is further believed that some prisoners were tasked with mixing the raw chemicals that were used, without protective equipment, and in a manner which may have produced a more toxic combination. To date,

it is believed that at least fifteen (15) other incarcerated persons at CMCF have cancer and are not receiving necessary, life-saving treatment.

25.     Today, Ms. Balfour suffers from Stage IV breast cancer which has metastasized and is now present in her lymph nodes, bones, and liver.  For at least a ten-year period during her incarceration at CMCF, Defendants, either jointly or severally, failed to recognize or outright ignored the presence of suspicious masses in Ms. Balfour's breasts, failed to inform her of the presence of those suspicious masses, and failed to conduct, order, or refer her for additional diagnostic examinations and/or procedures to confirm or deny the presence of breast cancer.  As a result of Defendants' failure to timely and accurately diagnose Ms. Balfour's breast cancer, she went untreated for years.  Rather than incur the additional expense for examinations and treatment to confirm the presence of cancer in Ms. Balfour's breasts, Defendants allowed her cancer to progress from Stage I, which was treatable, to Stage IV, which is spreading throughout her body and untreatable.

26.     Though Ms. Balfour's cancer has advanced to a stage which is no longer treatable and, ultimately, terminal, her cancer could have been treated and her prognosis would be more favorable had the Defendants taken her repeated requests for medical care seriously and conducted timely follow-up examinations and testing.  Instead, Defendants disregarded her requests and denied her additional diagnostic testing and/or treatment.  Now, Ms. Balfour's breast cancer has spread to her lymph nodes, bones, and liver and she faces a much worse prognosis from which she is unlikely to recover because Defendants, through their inadequate medical care and deliberate indifference to Ms. Balfour's serious medical needs, failed to provide reasonable and necessary care, including, but not limited to,

ordering additional diagnostic testing and/or referring Ms. Balfour to a higher level of care so that her cancer could be diagnosed and treated in an effective and expeditious manner.

### *Defendant Wexford's Policies and Procedures*

27.     From on or around June 2006 through June 2016, Wexford contracted with MDOC to provide medical services to incarcerated individuals in MDOC state prison facilities, including CMCF.

28.     Under its contract with MDOC, Wexford was obligated to ensure all incarcerated individuals were provided with adequate medical care in accordance with medically accepted American Correctional Association and National Commission on Correctional Health Care standards of care, as well as all laws of the State of Mississippi with respect to the provision of health care service delivery.

29.     Upon information and belief, Wexford adopted policies and/or procedures that, rather than ensure quality and timely medical care for incarcerated persons, resulted in delayed access to care, inadequate care, or no care whatsoever. These policies and procedures were designed to (1) cause substantial delays in approving, ordering, scheduling, and providing outside treatment; (2) hinder communication and collaboration among healthcare providers; and (3) diffuse responsibility across healthcare providers and administrators such that no one acts, feels, or even appears to be ultimately responsible or accountable for a patient's health. By diffusing responsibility for patient care and adding layers of bureaucracy, this model limited the provision of vital treatment and care which reduced the total medical expenses paid by Wexford and increased its annual profits.

30.     Wexford's policies and procedures additionally interfere with its physicians' independent and clinical judgment in diagnosing and treating their patients. On information and belief,

Wexford physicians are encouraged to spend as little time as possible with each patient, have limited decision-making authority to order medically indicated tests and procedures, and/or have no incentive or ability to ensure their patients' treatment needs are met once their cases have been referred to Wexford's Utilization Management team—especially with respect to patients' needs for those tests and procedures labeled "non-formulary" by Wexford. Utilization Management and other care team members were able to override the recommendations of the treating physician, often with no explanation or even communication of their decision. Such policies and procedures have resulted in the neglect of the serious medical needs of countless incarcerated individuals, including Ms. Balfour, while exponentially increasing corporate profits.

31.    On information and belief, Wexford's contract with MDOC contains financial incentives that encourage Wexford to reduce outpatient referrals and hospitalizations of incarcerated individuals. To further that goal, Wexford implemented lengthy and onerous procedures for approving referrals to higher levels of care which required several stages of internal review before the referral could even be approved. Wexford's treatment policies similarly encourage conservative care to cut costs, which causes their employees to withhold necessary medical care from incarcerated individuals with serious medical conditions which require further or frequent diagnostic testing, outside care, and/or costly medications. Ms. Balfour is one such incarcerated individual.

32.    On information and belief, the delays in conducting sufficient diagnostic testing and/or referring Ms. Balfour to a higher level of care were motivated, in part, by Wexford's financial incentives to minimize and/or deny outside referrals through its above-discussed policies and procedures.

### *Defendant Centurion's Policies and Procedures*

33.   Shortly following the exposure of an alleged bribery scandal involving Christopher Epps, the former commissioner of the MDOC and numerous third-party prison contractors, MDOC did not renew its contract Wexford.

34.   From on or around July of 2016 through October of 2020, Centurion contracted with MDOC to provide medical services at several state prison facilities, including CMCF.

35.   Utilizing similar terms as the prior Wexford contract, Centurion required a multi-step approval process involving the MDOC Specialty Care Coordinator and the MDOC Chief Medical Officer, both of whom were, upon information and belief, also employees of Centurion, for "all orders involving any special procedures or non-routine follow-up" for medical treatment. As demonstrated under the Wexford contract, this practice resulted in substantial delays and denials of treatment for incarcerated individuals, including Ms. Balfour.

36.   Centurion was also financially incentivized to reduce outpatient referrals and diagnostic testing. Centurion received compensation from MDOC on a per diem rate per inmate rate. However, MDOC had the ability to recoup a deduction in the event the MDOC paid "for alternative sources of inmate health care due to non-performance by Centurion." Centurion was further responsible for the cost of laboratory and pharmaceutical services that resulted from any specialty consultations. The terms similarly encouraged conservative care and cost cutting measures resulting in the deprivation of necessary medical care from incarcerated individuals, such as Ms. Balfour, with serious medical conditions requiring diagnostic testing, outside care, surgical procedures, and/or costly medications.

### *Defendant VitalCore's Policies and Procedures*

37.     Following the tenure of Centurion, MDOC contracted with VitalCore to provide medical services at several state prison facilities, including CMCF.

38.     From on or around November of 2020 to date, VitalCore contracted with MDOC to provide medical services at several state prison facilities, including CMCF.

39.     Utilizing similar terms as the prior Wexford and Centurion contracts, VitalCore also required a multi-step approval process involving the MDOC Specialty Care Coordinator and the MDOC Chief Medical Officer for "all orders involving any special procedures or non-routine follow-up" for inmate medical treatment. Like its predecessors, this practice resulted in substantial delays and denials of treatment for incarcerated individuals, including Ms. Balfour.

40.     VitalCore was also financially incentivized to reduce outpatient referrals and diagnostic testing and received compensation from MDOC on the same "per diem per inmate rate." However, MDOC had the ability to recoup a deduction in the event the MDOC paid for medical care which VitalCore did not provide.  VitalCore was further responsible for the cost of laboratory and pharmaceutical services that resulted from any specialty consultations. The terms similarly encouraged conservative care and cost cutting measures resulting in the deprivation of necessary medical care from incarcerated individuals, such as Ms. Balfour, with serious medical conditions requiring diagnostic testing, outside care, surgical procedures, and/or costly medications.

### *The Defendants Failure to Properly Diagnose Ms. Balfour's Condition*

41.     This issue began on or about June 1, 2011, when Ms. Balfour presented to Dr. Gloria Perry, the MDOC Chief Medical Officer and/or an employee of Wexford, Centurion, and VitalCore, for a bilateral mammogram.

42.    Ms. Balfour was taken to Central Mississippi Medical Center ("**CMMC**") for her 2011 mammogram. Dr. Derek Dyess, an employee of CMMC and/or Wexford, interpreted the mammogram and found "scattered benign appearing punctuate microcalcifications in both breasts," but no "significant interval changes or findings" suggesting malignancy. At that time, Dr. Dyess and/or Dr. Perry recommended a one-year follow-up screening.

43.    Despite Dr. Dyess' medical opinion that Ms. Balfour needed a one-year follow-up screening, the Wexford Defendants failed to schedule Ms. Balfour for another mammogram until 2013. During this time, Ms. Balfour frequently requested medical care and reported pain, tenderness, and "lumps" in her breasts.

44.    On or about January 2, 2013, Ms. Balfour returned to CMMC for a bilateral mammogram which was interpreted by Dr. Lane E. Rushing. According to Dr. Rushing, Ms. Balfour's bilateral mammogram revealed "benign-appearing calcifications," yet he recommended further diagnostic testing to "correlat[e] with physical findings" and "exclude palpable lesions." It was further recommended that Ms. Balfour follow-up with annual mammograms. However, the Wexford Defendants failed to provide further treatment or evaluation of Ms. Balfour for an additional three years despite her ongoing complaints.

45.    On or about January 6, 2016, Ms. Balfour returned to CMMC for a bilateral mammogram which was interpreted by Dr. Derek Dyess. According to Dr. Dyess, that mammogram revealed "interval development of a cluster of microcalcifications at 8 o'clock in central right breast," prompting him to recommend further diagnostic examination using spot magnification views. Dr. Dyess also noted other "scattered calcifications" which "appear stable and benign." At that time, Dr. Dyess and/or Dr. Perry recommended additional

imaging evaluation and/or comparison with prior studies to rule out malignancy, as well as annual follow-up mammograms.

46. On February 3, 2016, a mammogram of Ms. Balfour's right breast was conducted which indicated "fairly uniform rounded calcifications present in lateral right breast" which had "increased in number as compared to the previous study of 3 years earlier." Given the increase in number, Dr. Rushing recommended Ms. Balfour undergo follow-up mammograms every six (6) months "to assure lack of suspicious change."

47. Much like before, both the Wexford Defendants and the subsequent Centurion Defendants refused to provide Ms. Balfour with the recommended six (6) month follow-up mammogram. In fact, Ms. Balfour was not even seen by a healthcare provider after her February 2016 mammogram until over two years later.

48. On or about May 2, 2018, Ms. Balfour presented to Merit Health Central ("**Merit Health**"), the successor of CMMC, for a mammogram. During this visit, Dr. Joseph Oliver interpreted the mammogram and found that Ms. Balfour's breast tissue was "composed of scattered fibroglandular tissue" with "similar-appearing benign fibronodular changes and calcifications." Dr. Oliver did not identify any "concerning mass, architectural distortion, or suspicious calcification." Despite this determination, the facilities and/or providers used a medical billing code for this visit which is used for medical procedures involving a "malignant neoplasm in breast."

49. Over a year later, on or about November 6, 2019, Ms. Balfour returned to Merit Health for a mammogram. This visit was also assigned a medical billing code for procedures involving a "malignant neoplasm" in the breast. Dr. Oliver interpreted the mammogram and found that Ms. Balfour's breasts were "composed of scattered fibroglandular tissue"

with "coarse clustered calcifications" noted "within the inferolateral right breast" which "have increased slightly." According to Dr. Oliver, the "majority of calcifications [were] "popcorn-type" and benign with slightly more subtle amorphous calcifications anteriorly probably related to the same process." Dr. Oliver recommended a follow-up right diagnostic mammogram in six (6) months "to ensure appropriate stability."

50.    The Centurion Defendants again refused to provide Ms. Balfour with the recommended six (6) month follow-up mammogram.

51.    Two years later, on or around March 17, 2021, Ms. Balfour presented to Dr. Mohmed El Zein Ahmed for a mammogram. This visit was also assigned the medical billing code for procedures involving a "malignant neoplasm" of the breast. The mammogram was interpreted by Dr. Dyess who found an "interval increase of asymmetric density associated with relatively coarse calcifications scattered diffusely throughout the midportion of the mid to posterior right breast" and that the "calcifications overall have a benign appearance and have significantly increased in number from previous mammogram."

52.    Based on those findings, Dr. Dyess was of the opinion that "there [were] several stable benign-appearing circumscribed subcentimeter masses in the upper outer quadrant of the right breast" and recommended six (6) month follow-up imaging of the right breast to ensure "stability of these probably benign" findings.

53.    While the VitalCore Defendants did not refer Ms. Balfour for a mammogram six (6) months after her March 2021 mammogram, they did take her for a follow-up mammogram on November 3, 2021. On that day, Ms. Balfour presented to Dr. Ahmed for a mammogram. That mammogram was interpreted by Dr. Dyess who found an "interval increase in number of multiple irregular calcifications throughout much of the anterior right

breast" with "asymmetric density and scattered small nodular densities and mass lesions in the right breast" which appeared similar to previous mammograms. However, "given the increase in number of calcifications," Dr. Dyess recommended "a stereotactic biopsy to exclude malignancy" which was performed.

54. According to the pathologist analyzing the biopsy, Ms. Balfour had an "invasive mammary carcinoma" in her right breast which was "at least 14.0 mm in greatest extent, low combined histologic grade, and low proliferative rate" leading her to classify it as an "intermediate grade ductal carcinoma in situ, solid type with necrosis." After receiving the results of that biopsy, Dr. Dyess authored an "addendum" to his prior interpretation of Ms. Balfour's mammogram, in which he noted the presence of an "invasive mammary carcinoma" which was "malignant and concordant."

55. Though VitalCore, through the opinions of Dr. Ahmed and Dr. Dyess, were well aware that Ms. Balfour's recent biopsy confirmed the presence of cancer in her right breast, VitalCore would not inform Ms. Balfour of this fact until mere days before her release from the custody of MDOC on December 27, 2021.

56. After her release on December 27, 2021, Ms. Balfour made an appointment with Dr. Scott Morris Berry at University of Mississippi Medical Center. On January 3, 2022, Ms. Balfour presented to Dr. Berry and underwent a bilateral mammogram at that time. Because Dr. Berry could not get Ms. Balfour's medical records from Wexford, Centurion, and VitalCore to compare with her recent bilateral mammogram, he referred Ms. Balfour for a full battery of testing, including, but not limited to, needle biopsies of suspicious masses in her left and right breasts, MRIs of both breasts and of her thoracic spine, and a full body PET scan. After receiving the results from those tests, Dr. Berry determined that

Ms. Balfour had cancer in her right and left breasts, her lymph nodes, and her thoracic spine. Ms. Balfour's cancer is still spreading and, based on recent testing, is no present in several other bones and her liver.

57.    Upon information and belief, Dr. Berry compared the January 2022 mammogram to her previous mammograms and found that the carcinomas in Ms. Balfour's right and left breast were also present on those prior mammograms. Based on the mammograms, biopsies, PET scan, and lab work, Dr. Berry was of the opinion that her breast cancer was appropriately categorized as Stage IV.

58.    Thus, due to the deliberate indifference of the Defendants to Ms. Balfour's serious medical needs, her breast cancer was allowed to spread throughout her system and progress to the point that surgical intervention, such as a mastectomy, is simply not an option. Consequently, Ms. Balfour's condition is now untreatable and terminal.

### *The Defendants' Deliberate Indifference*

59.    Defendants responded to Ms. Balfour's serious medical condition with deliberate indifference. Defendants callously disregarded the signs that Ms. Balfour was suffering from a serious medical condition. Defendants failed to order recommended diagnostic testing or refer Ms. Balfour to an outside specialist. Defendants consistently delayed Ms. Balfour's diagnosis and treatment and failed to treat Ms. Balfour's symptoms despite her worsening condition. During each of these delays, Ms. Balfour's cancer continued to spread, and her prognosis worsened.

### CAUSES OF ACTION

### COUNT I
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Dr. Gloria Perry)**

60.     Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

61.     Dr. Perry, while acting under color of state law, performed her duties in a manner that evidenced deliberate, reckless and/or callous indifference to Ms. Balfour's serious medical need for proper diagnosis and treatment of her breast cancer, thus depriving Ms. Balfour of her rights protected by the Eighth Amendment of the United States Constitution.

62.     Dr. Perry was deliberately indifferent to Ms. Balfour's serious medical needs when she repeatedly failed to effectively treat Ms. Balfour's symptoms, including her complaints of pain and lumps in her breasts, as well as the presence of suspicious calcifications requiring additional diagnostic testing.  Though she knew or should have known that Ms. Balfour required further follow-up treatment and care, Dr. Perry instead utilized the bureaucratic policies and procedures of Wexford, Centurion, and VitalCore to deny Ms. Balfour any of the basic follow-up care that was recommended and to discourage her from continuing to seek such care.

63.     Dr. Perry was deliberately indifferent to Ms. Balfour's serious medical condition when she disregarded the findings and opinions of the radiologists conducting Ms. Balfour's mammograms and failed to schedule and/or refer Ms. Balfour's for additional follow-up treatment, including but not limited to, annual mammograms, bi-annual mammograms, and/or biopsies.

64.     Dr. Perry was further indifferent to Ms. Balfour's serious medical needs when she failed or refused to refer Ms. Balfour for annual mammograms, bi-annual mammograms, biopsies, and/or other diagnostic examinations.  These delays exacerbated Ms. Balfour's

condition and totally deviated from clearly established medical standards such that they constitute deliberate indifference to Ms. Balfour's serious medical needs.

65.     As a direct and proximate cause of Dr. Perry's deprivation of her Eighth Amendment rights, Ms. Balfour suffered physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more serious diagnosis, and a diminished life expectancy.

66.     Because of these injuries, Ms. Balfour is entitled to damages under 42 U.S.C. § 1983.

**COUNT II**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Wexford Health Sources, Inc.)**

67.     Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

68.     At all relevant times, Wexford was under contract with the State of Mississippi, through MDOC, to provide healthcare to incarcerated individuals at CMCF, including Ms. Balfour. In this capacity, Wexford acted under color of state law and was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Wexford and MDOC employees who were medical care providers to incarcerated individuals at CMCF.

69.     Wexford had policies and procedures that discouraged outpatient care and surgical treatment. Wexford personnel acted pursuant to these policies and procedures when they repeatedly failed to timely provide diagnostic services and failed to refer Ms. Balfour to an outside specialist. These failures amounted to deliberate indifference to Ms. Balfour's serious medical needs.

70.    As a direct and proximate cause of Wexford's policies and procedures that violated Ms. Balfour's Eighth Amendment rights, Ms. Balfour suffered physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more serious diagnosis, and a diminished life expectancy.

71.    Because of these injuries, Ms. Balfour is entitled to damages under 42 U.S.C. § 1983.

## COUNT III
### Respondeat Superior:
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983
(Against Wexford Health Sources, Inc.)**

72.    Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

73.    Wexford, through its agents, apparent agents, and/or employees, accepted Ms. Balfour as a patient. At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Wexford and had a duty to exercise due care and caution in the treatment of patients, including Ms. Balfour.

74.    At all relevant times, Wexford, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis and treatment of Ms. Balfour's cancer. Wexford's agents and employees received clear and persistent signs that further testing was necessary to diagnose Ms. Balfour's condition but failed to provide for the requisite diagnostic testing. Wexford's agents and employees also knew or should have known that an outside referral was necessary for Ms. Balfour to receive adequate diagnostic testing.

75.    As a direct and proximate cause of the negligent acts and omissions of Wexford's agents and employees, Ms. Balfour suffered severe physical and mental injuries.

76.    Wexford is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Balfour's cancer, including but not limited to Gloria Mangum Perry, M.D., Mohmed El Zein Ahmed, M.D., Joseph Arthur Oliver, M.D., Eric Lane Rushing, M.D., Derek Scott Dyess, M.D., Yvonne Barton, Katrice Funchess, Linda Nolan, Irish Harris, and any and all other doctors, registered nurses, certified nurse practitioners, certified nurse assistants, care coordinators, claims processors, and any staff members of Wexford responsible in whole or in part for diagnosing, treating, or securing treatment for Ms. Balfour.

77.    Because of these injuries, Ms. Balfour is entitled to damages in an amount to be determined by a jury.

## COUNT IV
### Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983
### (Against Centurion of Mississippi, LLC)

78.    Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

79.    At all relevant times, Centurion was under contract with the State of Mississippi, through MDOC, to provide healthcare to incarcerated individuals at CMCF, including Ms. Balfour. In this capacity, Centurion acted under color of state law and was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Centurion and MDOC employees who were medical care providers to incarcerated individuals at CMCF.

80.    Centurion had policies and procedures that discouraged outpatient care and surgical treatment. Centurion personnel acted pursuant to these policies and procedures when they repeatedly failed to timely provide diagnostic services and failed to refer Ms. Balfour to an outside specialist. These failures amounted to deliberate indifference to Ms. Balfour's serious medical needs.

81.    As a direct and proximate cause of Centurion's policies and procedures that violated Ms. Balfour's Eighth Amendment rights, Ms. Balfour suffered physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more serious diagnosis, and a diminished life expectancy.

82.    Because of these injuries, Ms. Balfour is entitled to damages under 42 U.S.C. § 1983.

**COUNT V**
**Respondeat Superior:**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Centurion of Mississippi, LLC)**

83.    Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

84.    Centurion, through its agents, apparent agents, and/or employees, accepted Ms. Balfour as a patient. At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Centurion and had a duty to exercise due care and caution in the treatment of patients, including Ms. Balfour.

85.    At all relevant times, Centurion, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis and treatment of Ms. Balfour's cancer. Centurion's agents and employees received clear and persistent signs that further testing was necessary to

diagnose Ms. Balfour's condition but failed to provide for the requisite diagnostic testing. Centurion's agents and employees also knew or should have known that an outside referral was necessary for Ms. Balfour to receive adequate diagnostic testing.

86.    As a direct and proximate cause of the negligent acts and omissions of Centurion's agents and employees, Ms. Balfour suffered severe physical and mental injuries.

87.    Centurion is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Balfour's cancer, including but not limited to Gloria Mangum Perry, M.D., Mohmed  El Zein Ahmed, M.D., Joseph Arthur Oliver, M.D., Eric Lane Rushing, M.D., Derek Scott Dyess, M.D., Yvonne Barton, Katrice Funchess, Linda Nolan, Irish Harris, and any and all other doctors, registered nurses, certified nurse practitioners, certified nurse assistants, care coordinators, claims processors, and any staff members of Centurion responsible in whole or in part for diagnosing, treating, or securing treatment for Ms. Balfour.

88.    Because of these injuries, Ms. Balfour is entitled to damages.

**COUNT VI**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against VitalCore Health Strategies, LLC)**

89.    Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

90.    At all relevant times, VitalCore was under contract with the State of Mississippi, through MDOC, to provide healthcare to incarcerated individuals at CMCF, including Ms. Balfour. In this capacity, VitalCore acted under color of state law and was responsible for the

creation, implementation, oversight, and supervision of all policies and procedures followed by VitalCore and MDOC employees who were medical care providers to incarcerated individuals at CMCF.

91.   VitalCore had policies and procedures that discouraged outpatient care and surgical treatment. VitalCore personnel acted pursuant to these policies and procedures when they repeatedly failed to timely provide diagnostic services and failed to refer Ms. Balfour to an outside specialist. These failures amounted to deliberate indifference to Ms. Balfour's serious medical needs.

92.   As a direct and proximate cause of VitalCore's policies and procedures that violated Ms. Balfour's Eighth Amendment rights, Ms. Balfour suffered physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more serious diagnosis, and a diminished life expectancy.

93.   Because of these injuries, Ms. Balfour is entitled to damages under 42 U.S.C. § 1983.

**COUNT V**
**Respondeat Superior:**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against VitalCore Health Strategies, LLC)**

94.   Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein

95.   VitalCore, through its agents, apparent agents, and/or employees, accepted Ms. Balfour as a patient. At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with VitalCore and had a duty to exercise due care and caution in the treatment of patients, including Ms. Balfour.

96.   At all relevant times, VitalCore, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis and treatment of Ms. Balfour's cancer. VitalCore's agents and employees received clear and persistent signs that further testing was necessary to accurately diagnose Ms. Balfour's condition but failed to provide the requisite diagnostic testing. VitalCore's agents and employees also knew or should have known that an outside referral was necessary for Ms. Balfour to receive adequate diagnostic testing.

97.   As a direct and proximate cause of the negligent acts and omissions of VitalCore's agents and employees, Ms. Balfour suffered severe physical and mental injuries.

98.   VitalCore is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Balfour's cancer, including but not limited to Gloria Mangum Perry, M.D., Mohmed El Zein Ahmed, M.D., Joseph Arthur Oliver, M.D., Eric Lane Rushing, M.D., Derek Scott Dyess, M.D., Yvonne Barton, Katrice Funchess, Linda Nolan, Irish Harris, and any and all other doctors, registered nurses, certified nurse practitioners, certified nurse assistants, care coordinators, claims processors, and any staff members of VitalCore responsible in whole or in part for diagnosing, treating, or securing treatment for Ms. Balfour.

99.   Because of these injuries, Ms. Balfour is entitled to damages.

**COUNT VIII**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Dr. Mohmed Zein Ahmed)**

100. Ms. Balfour realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

101. Dr. Ahmed, while acting under color of state law, performed his duties in a manner that evidenced deliberate, reckless and/or callous indifference to Ms. Balfour's serious medical need for diagnosis and treatment of her breast cancer, thus depriving Ms. Balfour of her rights protected by the Eighth Amendment of the United States Constitution.

102. Dr. Ahmed was deliberately indifferent to Ms. Balfour's serious medical needs when he repeatedly failed to effectively treat Ms. Balfour's symptoms, including her complaints of pain and lumps in her breasts, as well as the presence of suspicious calcifications requiring additional diagnostic testing.  Though he knew or should have known that Ms. Balfour required further follow-up treatment and care, Dr. Ahmed instead utilized the bureaucratic policies and procedures of Wexford, Centurion, and VitalCore to deny Ms. Balfour any of the basic follow-up care that was recommended and to discourage her from continuing to seek such care.

103. Dr. Ahmed was deliberately indifferent to Ms. Balfour's serious medical condition when he disregarded the findings and opinions of the radiologists conducting Ms. Balfour's mammograms and failed to schedule and/or refer Ms. Balfour's for additional follow-up treatment, including but not limited to, annual mammograms, bi-annual mammograms, and/or biopsies.

104. Dr. Ahmed was further indifferent to Ms. Balfour's serious medical needs when he failed or refused to refer Ms. Balfour for annual mammograms, bi-annual mammograms, biopsies, and/or other diagnostic examinations.  These delays exacerbated Ms. Balfour's

condition and totally deviated from clearly established medical standards such that they constitute deliberate indifference to Ms. Balfour's serious medical needs.

105.    As a direct and proximate cause of Dr. Ahmed's deprivation of her Eighth Amendment rights, Ms. Balfour suffered physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more serious diagnosis, and a diminished life expectancy.

Because of these injuries, Ms. Balfour is entitled to damages under 42 U.S.C. § 1983.

## COUNT IX
### Medical Malpractice – Gloria Mangum Perry, M.D.

106.    The allegations of paragraphs 1 through 73 are incorporated herein by reference.

107.    At all relevant times, Dr. Perry had a duty to treat and care for Ms. Balfor with the same or similar diligence, skill, competency and prudence as is practiced by minimally competent physicians who treat and diagnose breast cancer throughout the State of Mississippi and the United States.

108.    Dr. Perry, by her own actions, carelessly and recklessly failed to provide adequate medical treatment and care to Ms. Balfour, including, but not limited to, the following:

   a.   Failing to recognize and diagnose cancerous lesions, masses, and/or calcifications which were present in Ms. Balfour's right breast and reflected in the results from her annual mammograms;

   b.   Failing to refer, schedule, and/or perform additional diagnostic treatment and care for Ms. Balfour after her annual mammograms revealed suspected and/or concerning lesions, masses, and/or calcifications present in her right breast, including, but not limited to:

      i.   Failing to refer, schedule, and/or perform annual mammograms;

      ii.   Failing to refer, schedule, and/or perform bi-annual mammograms;

     iii.   Failing to refer, schedule, and/or perform an ultrasound;

     iv.   Failing to refer, schedule, and/or perform needle biopsies of suspected or concerning lumps, masses, and/or calcifications in Ms. Balfour's right breast;

   c.  Failing to inform Ms. Balfour of the presence of suspected or concerning lesions, masses, and/or calcifications which were reflected on her annual mammograms and/or the staging of any confirmed cancerous lesions, masses, and/or calcifications.

109. Upon information and belief, the failure of Gloria Mangum Perry, M.D. to carry out these duties proximately caused Ms. Balfour's breast cancer to advance from Stage 1, which was treatable, to Stage 4, which is untreatable. The conduct of Gloria Mangum Perry, M.D. failed to meet the standard of care owed by physicians to patients such as Ms. Balfour and constitutes common law negligence and gross negligence, entitling Ms. Balfour to compensatory damages for personal injury and punitive damages for the above-described willful, wanton, and capricious conduct of Gloria Mangum Perry, M.D.

110. Those Defendants for whom Dr. Perry was an agent or who employed Dr. Perry or supervised or directed her actions are also being sued in this Count under theories of vicarious liability.

## COUNT X
### Medical Malpractice – Dr. Mohmed Zein Ahmed

111. The allegations of paragraphs 1 through 77 are incorporated herein by reference.

112. At all relevant times, Dr. Mohmed Zein Ahmed had a duty to treat and care for Ms. Balfor with the same or similar diligence, skill, competency and prudence as is practiced by

minimally competent physicians who treat and diagnose breast cancer throughout the State of Mississippi and the United States.

113.  Dr. Mohmed Zein Ahmed, by his own actions, carelessly and recklessly failed to provide adequate medical treatment and care to Ms. Balfour, including, but not limited to, the following:

    a.  Failing to recognize and diagnose cancerous lesions, masses, and/or calcifications which were present in Ms. Balfour's right breast and reflected in the results from her annual mammograms;

    b.  Failing to refer, schedule, and/or perform additional diagnostic treatment and care for Ms. Balfour after her annual mammograms revealed suspected and/or concerning lesions, masses, and/or calcifications present in her right breast, including, but not limited to:

        i.  Failing to refer, schedule, and/or perform annual mammograms;

        ii.  Failing to refer, schedule, and/or perform bi-annual mammograms;

        iii.  Failing to refer, schedule, and/or perform an ultrasound;

        iv.  Failing to refer, schedule, and/or perform needle biopsies of suspected or concerning lumps, masses, and/or calcifications in Ms. Balfour's right breast;

    c.  Failing to inform Ms. Balfour of the presence of suspected or concerning lesions, masses, and/or calcifications which were reflected on her annual mammograms and/or the staging of any confirmed cancerous lesions, masses, and/or calcifications.

114.   Upon information and belief, the failure of Mohmed Zein Ahmed, M.D. to carry out these duties proximately caused Ms. Balfour's breast cancer to advance from Stage 1, which was treatable, to Stage 4, which is untreatable. The conduct of Mohmed Zein Ahmed, M.D. failed to meet the standard of care owed by physicians to patients such as Ms. Balfour and constitutes common law negligence and gross negligence, entitling Ms. Balfour to compensatory damages for personal injury and punitive damages for the above-described willful, wanton, and capricious conduct of Mohmed Zein Ahmed, M.D.

115.   Those Defendants for whom Dr. Ahmed was an agent or who employed Dr. Ahmed or supervised or directed his actions are also being sued in this Count under theories of vicarious liability.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial as to issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

A.   Judgment for compensatory damages against all Defendants jointly and severally in an amount to be determined at trial;

B.   Judgment for punitive damages against all Defendants jointly and severally in an amount to be determined at trial;

C.   Judgment for nominal damages to vindicate the violation of Plaintiff's rights under the Constitution of the United States of America;

D.   An award of the costs of this action against all Defendants jointly and severally, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

E.   Such other and further relief to which Plaintiff may be entitled as a matter of law or

equity or which the Court determines to be just and proper.

Respectfully submitted, this _14th_ day of February 2024.

Respectfully submitted,

**GEORGE F. HOLLOWELL, JR. (MSBN 2559)**
**ANDREW F. TOMINELLO (MSBN 104183)**
HOLLOWELL LAW FIRM
P.O. Drawer 1407
Greenville, MS 38702-1407
Telephone: (662)378 3103
Facsimile: (662) 378 3420

*Attorneys for Plaintiff Susie Annie Balfour, a/k/a
Susan Ann Balfour*

## ATTORNEY'S AFFIDAVIT OF PRE-CERTIFICATION

I, Andrew F. Tominello, have reviewed the facts of this case and have consulted with an expert qualified to give expert testimony as to the standard of care and/or negligence and said expert is knowledgeable in the relevant issues involved in this particular action. I have concluded that upon the basis of my review and consultation that there is a reasonable basis for the commencement of this action.

THIS, the 14th day of February _____, 2024.

_____
**ANDREW F. TOMINELLO**

**STATE OF MISSISSIPPI**
**COUNTY OF WASHINGTON**

**SWORN TO AND SUBSCRIBED BEFORE ME,** on this the 14th day of February _____, 2024.

_____
**NOTARY PUBLIC**

My Commission Expires:

_____

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 123563
SARAH VIRGINIA LOVE
Commission Expires
April 3, 2026
WASHINGTON COUNTY